UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

ERNESTO GERARDO ZEPEDA RAMIREZ                        PETITIONER

v.                                                   No. 5:25-cv-186-BJB

ADAM SMITH, ET AL.                                   RESPONDENTS

＊ ＊ ＊ ＊ ＊

OPINION & ORDER

Does a declaratory judgment between two parties bind both in later litigation? The answer seems simple: under longstanding principles of preclusion, a final judgment binds the parties in subsequent litigation from revisiting an issue fully and fairly contested and actually decided. RESTATEMENT (SECOND) OF JUDGMENTS § 33. But what if the first ruling is a declaratory judgment, interpreting a reticulated statutory removal scheme, running between the Government and a nationwide class of immigration detainees, brought to bear in a subsequent habeas proceeding? Does the black-letter rule still apply in an equally academic and forceful manner?

Not unreasonably, the Government asserts that these variables should change the answer. Despite multiple chances, however, the Government hasn't shown that they do—at least not so long as the declaratory judgment remains in effect. So under the rules of party presentation and preclusion, this Court—like the parties themselves—is bound to respect the prior judgment, regardless of whether it would've reached the same conclusion in the first instance.

### A. Prior Litigation

Until recently, the Department of Homeland Security authorized—but did not require—immigration officers to detain people, pending their removal proceedings, who were found within the United States after illegally entering the country. *See* Initial Preclusion Order (DN 42) at 1. Last summer, however, the Department adopted a new policy: immigration officers now consider illegal entrants residing in the interior subject to *mandatory* detention under 8 U.S.C. § 1225(b)(2) rather than permissive detention under § 1226(a).[1] In response, thousands of newly detained

---

[1] The parties all cite, and the Petitioner attaches, *see* DN 1-7, the DHS policy at issue. That policy seemingly cannot be found in the *Federal Register* or on an agency website, however. *See also Maldonado Vazquez v. Feeley*, 805 F. Supp. 3d 1112, 1129 n.2 (D. Nev. 2025) (describing an internal policy memorandum "leaked" to the American Immigration

immigrants filed habeas petitions that challenged their detention on statutory and constitutional grounds.  In this district and elsewhere, trial judges have grappled with these challenges on a case-by-case basis.  Some habeas petitions have succeeded, and others have failed—perhaps thanks to details that demand retail, not wholesale, adjudication.

Alongside these individual challenges, however, a group brought a putative class action in the Central District of California, seeking a declaratory judgment on behalf of a nationwide class that the Government's statutory interpretation was wrong.  A judge in that court certified and entered judgment in favor of the class. *Bautista v. Santacruz*, --- F. Supp. 3d ----, No. 5:25-cv-1873, 2025 WL 3713987, at *32 (C.D. Cal. Dec. 18, 2025).  The class includes:

> All noncitizens in the United States without lawful status who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the Department of Homeland Security makes an initial custody determination.

*Id.*  The court declared that "§ 1226(a) is the appropriate governing authority over the Petitioners' detention."  *Id.* at *10.  And based on this interpretation, the Central District also vacated (under the Administrative Procedure Act) the policy instructing ICE to detain aliens found in the United States.  *Id.* at *31–32.  The declaratory judgment ran against several federal defendants, including three named as Respondents here: Todd Lyons (the Acting Director of ICE), Kristi Noem (the Secretary of Homeland Security), and Pamela Bondi (the Attorney General).[2]

That declaratory judgment rejects the interpretation of the immigration statutes that federal officials have advanced—not only in the now-vacated agency policy, but also in this and many other individual habeas cases across the country. *Id.* at *10.  According to the Central District, aliens found living inside the United States "who have not been inspected and authorized by an immigration officer" are

---

Lawyers Association); Maria Sacchetti & Carol D. Leonnig, *ICE Declares Millions of Undocumented Immigrations Ineligible for Bond Hearings*, WASH. POST (July 15, 2025); *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, AM. IMMIGR. LAWYERS' ASS'N, Doc. No. 25071607 (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission (supplying an apparently genuine copy of the policy memo in question).

[2] Named defendants in the California class-action litigation include the Department of Homeland Security, the Executive Office for Immigration Review, Immigration and Customs Enforcement, the Acting Director of Immigration and Customs Enforcement, the Secretary of Homeland Security, and the Attorney General.

not "applicants for admission." *Id.* at *11. And only "applicants for admission" are subject to mandatory detention under 8 U.S.C. § 1225(b)(2). Instead, the Central District treats these individuals as "alien[s] [who] *may* be arrested and detained" under § 1226(a) (emphasis added). Under the statute, the Government doesn't *have* to detain these people. But if it does, § 1226(a)'s implementing regulations require the Government to offer a bond hearing and continue to detain the person only if the immigration judge agrees. *See* 8 C.F.R. § 236.1(c)(2)–(3) & (d)(1) (describing custody and release procedures).

### B. This Petition

Ernesto Gerardo Zepeda Ramirez is (undisputedly) a member of the *Bautista* class. He's a "47-year-old citizen of Mexico who has resided in the United States since approximately 2007, having entered through the southern border … without inspection about eighteen … years ago." Petition (DN 1) ¶ 29. Immigration officials arrested and detained him in the Christian County Jail. *See* ¶ 31. And he's been detained under the policy disputed in *Bautista*, which interpreted 8 U.S.C. § 1225(b)(2) to mandate pre-removal detention for "applicants for admission" in his shoes. *See* Government's Motion to Dismiss (DN 8) at 6.

Ramirez filed his habeas petition before the Central District's final judgment. That petition echoed many others across the country by alleging that mandatory pre-removal detention violated several constitutional and statutory provisions. *See* Petition at 52–74. Some district courts have agreed with the habeas petitioners' principal statutory argument, while others haven't. *Compare Vasquez v. Feeley*, 805 F. Supp. 3d 1112, 1137 (D. Nev. Sept. 17, 2025) ("§ 1226, not § 1225, applies to the Petitioner and others similarly situated"), *with Mejia Olalde v. Noem, et al.*, No. 1:25-cv-168, 2025 WL 3131942, at *1 (E.D. Mo. Nov. 10, 2025) ("The plain text provides that [the Petitioner] is an applicant for admission to the United States, so he is governed by § 1225(b)(2) and is ineligible to receive a bond hearing."). And at least one federal court of appeals, so far, has rejected the petitioners' statutory-interpretation argument on its merits. *See Buenrostro-Mendez v. Bondi*, --- F.4th ---, No. 25-20496, 2026 WL 323330 (5th Cir. Feb. 6, 2026).

Now that the district judge in the Central District of California agreed with the permissive-detention interpretation, Petitioner contends, the Central District's order precludes the Government from relying on § 1225(b)(2) to justify his detention. So without another reason to detain, his continued confinement is unlawful and a writ of habeas corpus requiring his release is warranted.

### C. Preclusion & This Court's Prior Order

The intervening *Bautista* ruling raised a new issue in this case: Does the Central District's declaratory judgment bar the Government from relying on

§ 1225(b)(2) here to justify Ramirez's continued detention?  The Petitioner said yes. To his mind, the Government cannot establish the lawfulness of his ongoing detention by relying on an interpretation of § 1225(b)(2) that another court has already adjudicated and rejected.  *See* Initial Preclusion Order.

Under settled principles of collateral estoppel, the Central District's final declaratory judgment binds the parties "with respect to the matters declared." RESTATEMENT (SECOND) OF JUDGMENTS § 33.  "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981).  That preclusive effect persists even if the judgment in question remains on appeal.  18A WRIGHT & MILLER § 4433 & n.13 (3d ed., supp. Sept. 2025) (citing *Deposit Bank of Frankfort v. Board of Councilmen of City of Frankfort*, 191 U.S. 499, 510–12 (1903)); *see id.* § 4404 ("[T]he general rule" is "that a judgment is entitled to preclusive effect even though an appeal is pending.").  At least when, as here, the losing party hasn't obtained (or even sought) a stay of the judgment's effectiveness on appeal.[3] And the decision continues to bind the same parties, disputing the same issue, even if another court harbors doubts about its correctness.  *Id.* § 4433 ("[R]es judicata does not depend on the correctness of the judgment.").

As discussed in this Court's prior opinion, that powerfully preclusive effect— when applied against the entirety of the federal immigration bureaucracy and in favor of the entirety of a nationwide class of immigrants—stretches the law of preclusion extraordinarily far.  The principles discussed above developed in a world

---

[3] Some authorities mention possible "exceptions" to the rule that a pending appeal doesn't sap a final judgment of its preclusive force.  Although these aren't particularly well settled or defined, some flexibility is warranted—the argument goes—for fear of "awkward results" that might follow "as two or more cases wend toward judgment at differing speeds," possibly risking "inconsistent judgments."  18A WRIGHT & MILLER § 4433.

That risk is less pronounced here, however, given that little if any knock-on preclusive effects would follow a habeas order from this Court.  If—for instance—the Petitioner were released based on the *Bautista* judgment before the Ninth Circuit later vacated it, neither *Bautista* nor this Court's habeas ruling would bar the Petitioner's rearrest and detention. Nor, for that matter, would this Court's order bar the Petitioner's rearrest and detention on another lawful and distinct basis.

In any event, the Government has forfeited any request that the Court apply any specific "exception" to these basic principles of preclusion.  *See* Government Response to *Bautista* (DN 37) at 5–6 (nodding to the possibility of a preclusion exception without developing any argument in support).  Nor has the Government squarely proposed any particular procedural path—such as a stay of this suit—that might avoid any inconsistency or "awkwardness" between *Bautista* and this Court's ruling.  Given this forfeiture, basic principles of party presentation foreclose any potential prophylaxis of the Court's own design.

without nationwide class actions and APA vacatur of governmental policy decisions.[4] At a minimum, their application here places enormous pressure on the decision when—*if ever*—to certify a nationwide class against a federal cabinet secretary. That judicial maneuver appears to exhume all the risks and innovations interred—at least in the garb of "nationwide injunctions"—only one term ago by the Supreme Court. *See Trump v. CASA, Inc.*, 606 U.S. 831, 867–68 (2025) (Alito, J., concurring) ("[I]f district courts award relief to broadly defined classes without following Rule 23's procedural protections for class certification," "the universal injunction will return from the grave under the guise of nationwide class relief, and today's decision will be of little more than minor academic interest.") (quotation marks omitted). Also worth remembering is the fundamentally *discretionary* nature of a declaratory judgment: no judge is ever compelled to issue a declaration—much less one purporting to reach nationwide—if discretion counsels against "the propriety of declaratory relief in a particular case." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 243 (1952)) (recognizing that Congress gave trial judges discretion to deny declaratory relief).

Had the *Bautista* declaration applied only districtwide, for example, the questions raised by the Government and in this Court's prior opinion would be far simpler. Once entered nationwide, however, a single district-judge ruling not stayed on appeal and taken seriously in other district courts would ossify the law nationwide—foreclosing executive "nonacquiescence" and circumventing the rule against governmental estoppel. *Cf.* Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679, 684–86 (1989) (using "a declaratory judgment procedure"—even initiated by agencies—to harmonize executive and judicial interpretation "would raise difficult constitutional and practical questions[,] would require a revamping of the way agencies make decisions, and would significantly undercut the role of agencies as the primary policymakers in our administrative lawmaking system"). The scope of preclusion in this new era may well bear reexamination. *See* Barrett, *Procedural Common Law*, 94 VA. L. REV. 813, 818 (2008) ("innovations" in judge-made doctrines like preclusion "are not usually abrupt

---

[4] Further increasing the pressure on contemporary preclusion law are its hazy and judgemade origins. "[T]he federal courts have not drawn the content of federal preclusion from any statutory or constitutional provision; rather, in fashioning preclusion law, the federal courts have drawn heavily from secondary sources and the practice of state courts." Barrett, *Procedural Common Law*, 94 VA. L. REV. 813, 818 (2008); *see also id.* at 830–32 ("There has been almost no discussion in the cases of where courts derive the authority to develop a common law of preclusion. ... As it stands, it is fair to say that the rules of preclusion are well understood, but the courts' authority to make them is not.") (citing, *e.g.*, *Semtek Int'l v. Lockheed Martin*, 531 U.S. 497, 507–08 (2001); Burbank, *Interjurisdictional Preclusion, Full Faith and Credit and Federal Common Law: A General Approach*, 71 CORNELL L. REV. 733, 747–48 (1986)).

departures from traditional principles" but instead "responses to emergent consensus about the need for change").

Practice likewise suggests that trial judges today remain uncomfortable with a nationwide declaratory determination. For different reasons and to different ends, most of the follow-on immigration habeas decisions to address *Bautista* at all have tiptoed around its preclusive scope and effect.[5] That "emergent," or even allergic, reaction is noteworthy. *Id.* at 818 (citing changes in preclusion law as an example of "inherent procedural authority" of courts "when neither tradition, emergent consensus, nor the enacted law governs a particular procedural matter"). Judges of all stripes have understandably balked at the notion that one judge may bind not just the Executive Branch with respect to enforcement policy, but also other district judges on otherwise individualized habeas determinations.

The Government likewise resists the automatic and nationwide effectiveness of the *Bautista* judgment. It initially lodged two main objections: first, an attack on the legality of a nationwide and classwide declaratory judgment on a question clearly related to habeas relief, and second, a challenge to the preclusive effect of the California judgment.

The Government's first objection, however, didn't "offer a reason for this Court—as opposed to an appellate court—to relieve the Government of the binding nature of a final judgment." Initial Preclusion Order at 4. Despite significant "first-order concerns about the prudence, and perhaps even the lawfulness, of the *Bautista* decision," *id.*, "the Court has little leeway to second-guess a final judgment after full and fair litigation," *id.* at 8. As noted above, the legality of a single judge's declaratory judgment on the issue of mandatory detention surely stifles the development of the law and may offend the principle that habeas relief is limited to the district of confinement. But the Government raised this argument, relying on *Rumsfeld v.*

---

[5] *See, e.g., Ramirez v. Holt*, No. 2:25-cv-156, 2026 WL 226964, at *7 (E.D. Ky. Jan. 28, 2026) (denying habeas) ("[T]he Central District of California plainly did not order any kind of relief that would bind this Court, which means that its opinions … can have no more than persuasive authority."); *Quintero v. Francis*, No. 25-cv-10107, 2026 WL 265921, at *6 & n.4 (S.D.N.Y. Feb. 2, 2026) (denying habeas) ("[T]he *Bautista* order does not bind this Court with respect to Petitioner's request for habeas relief."); *Velasquez v. Noem*, No. 3:25-cv-998, 2026 WL 279226, at *5 (E.D. Va. Feb. 3, 2026) (granting habeas) ("[T]he Court takes no position on whether Mr. Velasquez is properly considered a member of the *Bautista* class."); *Lopez v. Noem*, No. 25-cv-4089, 2026 WL 206220, at *5 (D. Colo. Jan. 27, 2026) (granting habeas) ("[H]aving decided Mr. Diaz's substantive claims on their merits, the Court respectfully declines to reach the question of whether Mr. Diaz could also obtain relief pursuant to the district court's order in *Maldonado Bautista*."); *Godos v. Bondi*, No. 4:26-cv-20, 2026 WL 243923, at *2 (S.D. Ind. Jan. 29, 2026) (granting habeas) ("*Bautista* and the declaratory judgment issued in that case are not binding here.").

*Padilla*, 542 U.S. 426 (2004), before the Central District, and that court squarely rejected it. *See, e.g.*, *Bautista*, 2025 WL 3713987, at \*14 (discussing *Padilla*'s district-of-confinement rule).

That fact is dispositive here. Had the federal Respondents failed to litigate the issue before the Central District, latent jurisdictional concerns might well have supported a collateral attack on that judgment. *See, e.g.*, *Rose v. Himely*, 4 Cranch 241, 269 (1808) ("[T]he operation of every judgment must depend on the power of the court to render that judgment.") (overruled on other grounds); *Ex parte Watkins*, 3 Pet. 193, 202–03 (1830) ("The judgment of a court of record whose jurisdiction is final, is as conclusive on all the world as the judgment of this court would be."). The federal Respondents pressed the potential jurisdictional defects in the Central District, however, and that court rejected their position. *Bautista*, 2025 WL 3713987, at \*5. That full and fair opportunity to litigate the Central District's jurisdiction prevents the federal Respondents from re-litigating the question here: res judicata principles "apply to questions of jurisdiction as well as to other issues." *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 78 (1939) (citation omitted). *See also Durfee v. Duke*, 375 U.S. 106, 116 (1963) ("when … the jurisdictional issues had been fully and fairly litigated by the parties and finally determined in the [first court], the [second court] was correct in ruling that further inquiry was precluded"); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009) ("So long as respondents or those in privity with them were parties to the [first] proceeding, and were given a fair chance to challenge the [first court's] subject-matter jurisdiction, they cannot challenge it now."); *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon an adverse judgment.").[6]

---

[6] Consistent with the discussion above in n.3, courts and commentators have recognized "the possibility of … exceptions" to the principle that a first forum's jurisdictional conclusions are *res judicata* in a second forum. *Durfee*, 375 U.S. at 114 n.12; *see* RESTATEMENT (SECOND) OF JUDGMENTS § 12 (collateral attack for lack of subject-matter jurisdiction barred "unless: (1) the exercise of jurisdiction constituted a 'manifest abuse of authority'; (2) 'allowing the challenged judgment to stand would substantially infringe the authority of another tribunal or agency of government'; or (3) 'the judgment was rendered by a court lacking capability to make an adequately informed determination' as to its own jurisdiction"). But the reasoning behind such limitations is even hazier than that discussed above in the appellate context. *See* 18A WRIGHT & MILLER § 4428 ("Today, it is safe to conclude that most federal-court judgments are res judicata notwithstanding a lack of subject-matter jurisdiction. There may be exceptions, however, and matters are more complicated when state courts become involved."); RESTATEMENT (SECOND) OF JUDGMENTS § 10 (discussing limits on preclusion). Again, the Government has advanced no such arguments here.

And in any event, as this Court observed in its initial order, whether *Padilla*'s rule is truly jurisdictional is hardly clear. Although *Padilla* used the word "jurisdiction" to describe the district-of-confinement requirement, *see* 542 U.S. at 443, context indicates this is a rule of venue—not subject-matter jurisdiction. Chief Justice Rehnquist's opinion said as much: "[t]he word 'jurisdiction' … is capable of different interpretations," and *Padilla* "use[d] it in the sense that it is used in the habeas statute …, and *not in the sense of subject-matter jurisdiction of the District Court*." *Padilla*, 542 U.S. at 434 n.7 (emphasis added). That lawsuits "necessarily imply[ing] the invalidity of [the claimant's] confinement" are "core habeas petitions"—ordinarily decided in the district of confinement—is surely a mark against a *Bautista*-style nationwide declaration that could affect countless habeas petitions outside the district of confinement. *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (quoting *Padilla*, 542 U.S. at 443). But that goes to the ruling's correctness, not its effectiveness. *See, e.g.*, WRIGHT & MILLER § 4404 n.24 ("Wrong judgment precludes.").

The Government's second objection, meanwhile, never squarely confronted the black-letter preclusion law discussed above. Instead, the Government advanced four "equitable" arguments—urging this Court to "exercise its discretion to decline" to afford *Bautista* full preclusive force. Government Response to *Bautista* at 8. But whatever discretion the Court may have on that score, the Government never clearly explained where it comes from, when it should apply, or why it overcomes the binding preclusion precedents discussed in this Court's initial preclusion opinion.

*First*, the *Bautista* final judgment remains preclusive while it's pending before the Ninth Circuit. *See* above at 4 (citing 18A WRIGHT & MILLER § 4404).

*Second*, the Petitioner's reliance on *Bautista* doesn't disrespect 28 U.S.C. § 2202, which authorizes a prevailing party to convert a declaration into an injunction. His petition doesn't ask this Court to enforce the *Bautista* judgment, but instead to order release notwithstanding the Government's purported rejection of that final, binding ruling.

*Third*, although nonmutual estoppel typically doesn't run against the Government, the Central District's class certification makes this an issue of *mutual* estoppel. True, the scope of the Central District's certification appears to "substantially thwar[t] the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *United States v. Mendoza*, 464 U.S. 154, 160, 162 (1984) ("hold[ing] … that nonmutual offensive collateral estoppel simply does not apply against the government"). Those principles should, at the least, counsel caution regarding certification of a broadly defined declaratory-judgment class litigating against the Government. But however this principle might

guide a first forum, it does not revise the settled law governing *mutual* preclusion that binds this second forum.

*Fourth* and finally, the Government's reliance on principles of criminal issue preclusion lacked merit: Applying a binding civil judgment differs from revisiting issues raised on postconviction review. *See* Initial Preclusion Order at 8–9.

Having explained its initial views on the preclusion issue, the Court gave the parties an opportunity to respond. And the order further directed the Government to provide "other lawful reasons to detain the Petitioners, or a reason that Bautista does not preclude it from advancing the reasons it has relied on so far." *Id.* at 10. Otherwise, habeas relief would be appropriate. *Id.* Both sides responded, but neither brief alters the Court's prior interpretation of the Central District's judgment and the law of preclusion.[7]

### D. Preclusion & Habeas Relief

**1.** Statutory interpretation. The Government's supplemental response first suggests *Bautista* lacks preclusive effect because it concerns statutory interpretation. The statute, the Government maintains, "speaks for itself" and is "authoritative in its own right." Government Br. (DN 43) at 2. Yet *Bautista* rejected the federal Respondents' reliance on § 1225(b)(2) and declared, based on its interpretation of the statute, that only § 1226(a) authorizes detention of the class members. The Government offers no reason why preclusion would apply only to questions of contract or tort, and not to statutory interpretation. Indeed, many such counterexamples exist. "This scenario"—applying preclusive effect to a judgment interpreting a statute—"is textbook collateral estoppel." *Carter v. Commissioner of Internal Revenue*, 746 F.3d 318, 322 (7th Cir. 2014).[8]

**2.** Administrative guidance. Nor does it matter that *Bautista* purported to vacate an agency interpretation of a statute that came in the form of a policy or

---

[7] The Petitioner's response, for its part, repeatedly mischaracterizes the Court's prior opinion. The Court never "found that the Government's interpretation of § 1225(b)(2) to cover noncitizens who have resided in the interior of the country for years was inconsistent with the statutory structure." Ramirez Response (DN 44) at 4. The opinion never addressed the merits of the statutory-interpretation issue—just the Central District's decision.

[8] *See, e.g.*, *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 171–73 (1984) (United States estopped from relitigating decision interpreting the Clean Air Act) (affirming 684 F.2d 1174 (6th Cir. 1982)); *B&B Hardware, Inc. v. Hargis Industries*, 575 U.S. 138, 154 (2015) (defendant estopped from relitigating decision about one statute by invoking another statute); *Tait v. W. Maryland Railway Co.*, 289 U.S. 620, 625–26 (1933) (United States estopped from relitigating decision applying tax statutes); *United States v. Moser*, 266 U.S. 236, 240–41 (1924) (United States estopped from relitigating decision interpreting the Navy Personnel Act).

enforcement-guidance document. *See* Government Br. at 2. The portion of the Central District judgment purporting to vacate the ICE policy doesn't much matter for purposes of follow-on habeas petitions challenging detentions initiated under that policy. The question here reduces to whether the Government advances a valid reason to continue holding the Petitioner—and that question turns on which interpretation of the statutory scheme is correct. The Central District rejected the Government's interpretation; that it did so in the course of affording a remedy different than the one sought here makes no difference. Issue preclusion prevents "relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (quoting *Gargallo v. Merrill Lynch, Pierce, Fenner & Smith*, 918 F.2d 658, 661 (6th Cir. 1990)). These decisions expounding the law of preclusion focus on the questions actually litigated and decided—even if under a different cause of action, and irrespective of the remedies that followed.

**3.** <u>Immigration-court precedent</u>. What about another administrative interpretation—the *Yajure Hurtado* decision by the Board of Immigration Appeals? *See* 29 I. & N. Dec. 216 (2025). That ruling decided that immigration judges may not hold detention hearings because Homeland Security's interpretation of § 1225(b)(2) bars them. The Government rightly observes that this decision retains force despite the preclusive effect of *Bautista*, which didn't purport to overrule *Yajure Hurtado*.[9] *See* Government Br. at 2. Based on this, the Government describes bond hearings as impossible. *Id.* at 6 ("DHS employees … remain bound [by *Yajure Hurtado*] to deny bond hearings.") (quoting *Calderon Lopez v. Lyons*, --- F. Supp. 3d ---, No. 1:25-cv-226, 2025 WL 3683918 (N.D. Tex. Dec. 19, 2025)).

The Government draws two conclusions from this premise. First, that without adjudicating the lawfulness of *Yajure Hurtado*, the *Bautista* court issued a legal declaration, not an adjudication of the parties' rights. *Id.* at 4. Second, that *Bautista* provided no meaningful redress and thus "violated the prohibition on providing advisory opinions," *id.* at 3 (citation omitted).

Neither conclusion follows.

As to lack of redress, the Government's position seemingly mischaracterizes the nature of declaratory judgments. A declaratory judgment, like *Bautista*'s, has the

---

[9] At least not as of the date of the Central District's final judgment, entered on December 18. While this Court was preparing this opinion, however, the California district court purported to vacate the BIA's decision in *Hurtado*. *See Bautista v. Santacruz*, No. 5:25-cv-1873 (DN 116). That decision has no bearing on this one, however.

"force and effect of a final judgment." 28 U.S.C. § 2201. The *Bautista* court declared that § 1225(b)(2) gives the Government no authority to detain class members. That judgment binds the Government. *Yajure Hurtado* may complicate efforts to detain class members in reliance on § 1226(a). *See* Government Br. at 6 ("DHS employees … remain bound [by *Yajure Hurtado*] to deny bond hearings.") (citation omitted). But that doesn't affect the validity of the Central District's declaration about the petitioners' rights and the Government's authority under § 1225(b). No one contends that the Board of Immigration Appeals' decision binds federal district courts as a matter of stare decisis or preclusion. So whether *Yajure Hurtado* continues to bind immigration judges matters little in this proceeding. The question here is simply whether the Government may justify the Petitioner's detention based on § 1225(b). *Yajure Hurtado*, should the Executive continue to respect it, may foreclose that portion of Petitioner's requested relief seeking a bond hearing. *See* Government Br. at 2 (characterizing *Bautista* as "ineffective because it does not vacate *Yajure Hurtado*'s … binding policy prohibiting immigration judges from granting bond hearings") (citation omitted). But it doesn't foreclose the portion seeking relief in the absence of a bond hearing. The *Bautista* court (originally) held that *should* the Government wish to continue detaining class members, it must afford them bond hearings. *See Bautista*, 2025 WL 3713987, at *21–22, *28.[10]

The "advisory opinion" argument, meanwhile, receives the most attention in the Government's response. At least with respect to questions of statutory interpretation, the supplemental brief contends, a plaintiff who seeks "only declaratory relief … lacks standing" under Article III because a declaration alone isn't coercive. Government Br. at 3–4 (citation omitted).

This is an ambitious and curious position to take, seeming as it does to call into question the constitutionality of declaratory relief generally and the Declaratory Judgment Act specifically. The Supreme Court upheld the constitutionality of the Declaratory Judgment Act nearly a century ago. *Aetna Life Ins. v. Haworth*, 300 U.S. 227 (1937). And that decision—along with many later ones—squarely addressed the "case and controversy" question that troubles the Government here. The Supreme Court held that courts may grant freestanding declaration requests without steering into advisory waters so long as the declaration affords "specific relief through a decree of conclusive character." *Id.* at 241. A court can only do that, of course, "[i]n a case

[10] It makes no more difference that the representatives of the *Bautista* class had apparently "[a]ll … received bond hearings and … releas[e]" before the Central District entered final judgment. Government Br. at 6 (citation omitted). Assuming this is true and that it defeated the standing of the proposed class representatives, it doesn't affect the validity of the judgment as to the rest of the class. For in the context of transient detention, a representative's loss of standing doesn't defeat the standing of other proposed class members. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975).

of actual controversy within its jurisdiction." 28 U.S.C. § 2201. And the Supreme Court "has been on alert against use of the declaratory judgment device for avoiding the rigorous insistence on exigent adversity as a condition for evoking Court adjudication." *Poe v. Ullman*, 367 U.S. 497, 506 (1961). But in cases that "retai[n] the essentials of an adversary proceeding, involving a real, not hypothetical, controversy," *id.* at 507 (quotation marks omitted), the availability of a declaratory judgment, consistent with Article III limits on judicial authority, remains black-letter remedies law. *See Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (requiring "preclusive effect on a traditional lawsuit that is imminent") (quotation marks omitted).

So it's true that *if* the *Bautista* judgment lacked preclusive effect, it would then be advisory. But the Government's assertion that this judgment *does* lack preclusive effect begs the question. As noted above and in the prior opinion, a declaratory judgment may carry fully preclusive effect. *Haaland*, 599 U.S. at 293. And although a declaration alone isn't coercive, Congress provided that a party bearing a declaration may return to the court that issued it and seek a corresponding coercive order. 28 U.S.C. § 2202; *see* Bray, *The Myth of the Mild Declaratory Judgment*, 63 DUKE L.J. 1091, 1110–11 (2014). Under settled Supreme Court precedent, these features dispel the worry that a declaration is just an opinion without an adjudication.

**4.** <u>Remaining contentions</u>. The Government advances one alternative theory for continued detention, relying on § 1226—the permissive-detention provision that envisions bond hearings. Government Br. at 7. Even if the Court affords *Bautista* preclusive effect, the Government says, "the Court should still not release Petitioner." *Id.* Because the permissive-detention provision authorizes detention *until* a hearing to determine bond eligibility, immediate release would contradict that scheme. The decision whether to grant bond is committed to executive discretion, and § 1226(a) "does not provide a noncitizen with a right to release on bond." Government Br. at 8–9.

True, bond decisions depend on a host of factors marshalled by BIA precedent and are subject to BIA review. *See id.* & n.3 (collecting regulations and BIA decisions); 8 C.F.R. §§ 236.1(d)(3), 1003.19(f), 1003.38, 1236.1(d)(3). And the Government may well be correct that bond decisions elude substantive Article III review by virtue of Congress's choice to commit them to agency discretion. *Cf.* 5 U.S.C. § 701(a)(2). But courts "routinely" vindicate procedural rights regardless of the substantive outcomes a process may yield. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9, 25 (2018). So agency discretion to hold a hearing yet deny bond doesn't strip courts' authority to insist on a hearing in the first place.

12

Next, the Government advances a sequencing argument, suggesting that because § 1226(a) "provides for detention until a bond proceeding is adjudicated," courts cannot order release *unless* a bond hearing happens.  Government Br. at 7; *see also id.* at 9 ("Release after a finding that 8 U.S.C. § 1226 is applicable … must only occur after the detained noncitizen moves for a bond hearing, an immigration judge grants bond, an appeal is not timely filed, and bond is paid.  Section 1226 does not permit release prior to the issuance and posting of bond.").  The Government's circular argument seems to be that detainees can't demand relief for the lack of bond hearings until they've received bond hearings.  But the Petitioner's claim is of course that § 1226(a) *doesn't* give the Government the power to detain unless it provides a hearing.  Right or wrong, the *Bautista* court vindicated that assertion.

### E.  Relief

The Government is correct insofar as it suggests that immediate release is not the sole available remedy for the Petitioner.  District courts have fashioned flexible—even aggressive—remedies after holding that § 1226(a), not § 1225(b)(2), applies.  These courts have given the federal Respondents an opportunity to provide a bond hearing (notwithstanding *Yajure Hurtado*) before mandating release.  *See, e.g., Hernandez v. Bondi,* No. 1:25-cv-1680, 2025 WL 3687353, at *9 (W.D. Mich. Dec. 19, 2025) ("The Court will order Respondents to provide Petitioner with a bond hearing under 8 U.S.C. § 1226(a) within five business days of the date of this Court's opinion and judgment or, in the alternative, immediately release Petitioner from custody.").

Until now, the Government has maintained that § 1225(b)(2) authorizes its continued detention of the Petitioner.  But *Bautista*'s final judgment, as explained in this Court's opinions, precludes that reliance.  Now limited to and by § 1226(a), the Government must follow the bond-hearing and eligibility framework required by that statute and its implementing regulations.  Without adherence to those procedures, the Government lacks a lawful basis for the Petitioner's continued detention and, therefore, must release him.[11]

---

[11] The Government also moved to dismiss for lack of jurisdiction given the jurisdiction-stripping provisions of the Immigration and Nationality Act.  *See* Government Motion to Dismiss at 3–5 (citing 8 U.S.C. §§ 1252(b)(9), (g)).  That statute routes removal appeals to the courts of appeals and forbids district courts to "hear any cause or claim … arising from the decision or action … to commence proceedings, adjudicate cases, or execute removal orders against any alien."  § 1252(g).  It further bars jurisdiction to decide any "questions of law and fact … *arising from*" such decisions or proceedings."  § 1252(b)(9) (emphasis added).  As interpreted by the Supreme Court, however, the statute doesn't reach petitions like this one.  Although these "capacious phrases" *could* reach far enough to cover unlawful-detention claims like the Petitioner's, a plurality of the Court rejected such an "expansive interpretation," partly on the ground that it would produce a "staggering resul[t]."  *Jennings v. Rodriguez,* 583 U.S. 281, 293 (2018) (Alito, J., plurality op.).  And three more justices agreed

## ORDER

Because the Government hasn't offered a reason to doubt the preclusive effect of the *Bautista* final judgment, it cannot rely on § 1225(b)(2) to subject the Petitioner to mandatory detention during the pendency of his removal proceedings. So the Government must, within five days, either release the Petitioner or else provide him with a bond hearing, consistent with § 1226(a) and its implementing regulations. The Court further directs the parties to provide a joint status report within seven days of this order to certify compliance with the Court's opinion. That report should state whether the Petitioner received a bond hearing and its outcome if any.

Benjamin Beaton, District Judge
United States District Court

February 20, 2026

---

for similar reasons. *See id.* at 354–55 (Breyer, J., dissenting). So despite the textual appeal of the Government's reading, *see id.* at 315–23 (Thomas, J., concurring in judgment); *see also Khalil v. President of the United States*, 164 F.4th 259, 273–77 (3d Cir. 2026), precious little daylight exists between this Petitioner's position and that adopted by seven Justices of the Supreme Court. This result also accords with the venerable canons of construction favoring judicial review and disfavoring repeals of habeas jurisdiction. *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001). So the Court is bound to deny the Government's motion to dismiss for lack of jurisdiction.